[File No. 6115.]

STATE OF NORTH DAKOTA, on the Relation of the OLD LINE
LIFE INSURANCE COMPANY of America, a Corporation,
Appellant, v. S. A. OLSNESS, Commissioner of Insurance of the
State of North Dakota, Respondent.

(249 N. W. 694.)

Opinion filed March 18, 1933. Rehearing denied August 1, 1933.

W. E. *Hoopes* and *E. B. Stevens* (*McIntyre & Burtness, Sinness & Duffy, Houska & Stevens* and *Kelsch & Higgins*, all of Counsel), for appellant.

698

*James Morris*, Attorney General and *Edward B. Cox*, Special Assistant Attorney General, for respondent.

BIRDZELL, J. This is a proceeding in mandamus to compel the defendant, as commissioner of insurance, to refund certain so-called hail insurance taxes paid by it upon land upon which it held a mortgage and the title to which it acquired through foreclosure. After a hearing in district court upon stipulated facts, the plaintiff's petition for a writ was denied and a judgment of dismissal entered. The plaintiff appeals.

The litigation presents but a single ultimate question, namely, whether, under chapter 171 of the Session Laws of North Dakota for 1931, the plaintiff is entitled to a refund of the hail taxes paid by it in the circumstances stated below.

In August, 1917, John Clark and his wife joined in mortgaging to the plaintiff certain land in Ward county. Subsequently, the mortgage, being in default, was foreclosed and a sheriff's certificate of sale issued to the plaintiff, the mortgagee, on the 25th of August, 1923. There being no redemption, in due time a sheriff's deed issued to the plaintiff. In April, 1923, prior to the foreclosure, the plaintiff paid the 1921 and 1922 taxes on the property, including penalty and interest, and hail indemnity taxes for these years. During the year for redemption from the foreclosure sale the plaintiff paid the 1923 taxes, which payment included the hail indemnity tax for 1923. It is alleged that these indemnity taxes were paid in connection with the payment of the general property taxes to avoid accumulation of interest and penalties, that the county treasurer at the date of the payments would not accept payment of the general taxes unless the hail indemnity taxes were included, and that the payments were made by the mortgagee for the purpose of protecting its rights under its mortgage. After chapter 171 of the Session Laws of 1931 had gone into effect and prior to December

31, 1931, the plaintiff applied for a refund of the hail indemnity taxes so paid, using forms prepared and furnished by the defendant. The plaintiff alleges full compliance with the provisions of chapter 171 and contends that it is entitled to the refund by virtue of said law.

The defendant denies that the county treasurer refused to accept payment of the general taxes separate from the hail indemnity tax, denies that the payments were made under compulsion and charges that they were made voluntarily; and further alleges that as to the indemnity taxes for 1921 and 1922 plaintiff has been reimbursed in that such payments were included in the lien of the mortgage foreclosed and in the amount bid by the plaintiff at the sale. He further alleges that there are no moneys available for the payment of said refunds, so that the claims could not be paid though legal and valid. He alleges that the reserve fund set aside for the purpose of making refunds was totally exhausted and depleted before the plaintiff's claim was presented. Other specific contentions are made which will be later noted.

Upon the hearing in district court, the payments made were stipulated, and it was further stipulated that the plaintiff did not tender the amount of the general taxes separate from the hail indemnity taxes and made no demand upon the county treasurer that the general taxes be accepted apart from the hail indemnity tax. But it was also stipulated that from the time of the taking effect of the state hail insurance law, which provided for the levying of the hail indemnity tax, down to the final decision of this court in the case of Davis v. McLean County, 52 N. D. 857, 204 N. W. 459, the hail indemnity tax levied against any given tract in any year was considered by all tax levying and collecting officials as part of the legal tax and was required by such officials to be paid simultaneously with the payment of other taxes, and that at the time of the payments made to the treasurer of Ward county he labored under the belief that he had no right or authority to accept the general tax without requiring the payment of the hail indemnity tax. There were some further stipulations made, subject, however, to the objection that they were incompetent, irrelevant and immaterial, to the effect that certain refunds of hail indemnity taxes had been made to the state land department and others where payments had been made in circumstances similar to those in the instant case; that is, where hail indemnity taxes had been paid by mortgagees, including the state land

department, who had subsequently foreclosed the mortgages and included in the bid at the foreclosure sale the amount of the taxes thus paid. There were also stipulations with respect to the status of accounts in the hail insurance department, which will be referred to as they become material in considering the questions presented upon this appeal.

A word with reference to the history of hail insurance indemnity taxes will perhaps conduce to an understanding of the questions argued on this appeal. The state hail insurance department was established by the legislative assembly in 1919. Sess. Laws 1919, chap. 160. This law was amended and re-enacted in 1921. Laws 1921, chap. 77. Reference to the latter act will show that it provided for levying an indemnity hail tax adequate to cover losses upon risks assumed or not withdrawn and that such levy was treated as a tax for purposes of collection. But in view of the constitutional authority for the legislation and of the voluntary character of the burden, it was held in the case of Davis v. McLean County, supra, that the "indemnity hail tax" was not a tax within the purview of the constitution and was not a lien paramount to antecedent real estate mortgages. This decision became final in June, 1925. At tax sales previously held, however, hail indemnity taxes had been included in certificates along with the general real estate taxes pursuant to § 10 of the 1921 law. In view of the fact that the holders of such certificates of tax sale could not subsequently realize upon their certificates to the extent of the hail indemnity payments as against holders of prior mortgages, the legislature in 1927 provided for refunds to such holders. Sess. Laws 1927, chap. 172. In 1929 this act was amended so as to provide for extending the right of refund to the holders of liens paramount to the hail indemnity tax lien who had paid such hail indemnity in connection with the payment of the general taxes. This act was in turn amended in 1931 by the enactment of chapter 171, Session Laws of 1931. The questions presented on this appeal hinge largely upon §§ 3, 4 and 5 of chapter 171, Session Laws of 1931. These sections are quoted below. The italicized words and figures represent the amendments made in 1931. Omitting the italicized portions, therefore, these sections would read as §§ 3, 4 and 5 of chapter 147, Session Laws of 1929.

"Section 3. Any holder of a lien paramount to the hail indemnity tax lien who, *prior to July 1st, 1926,* had paid *under compulsion* hail

indemnity taxes in connection with the payment of general taxes against the land covered by his lien, which hail indemnity taxes have been paid over by the County Auditor or Treasurer to the State Treasurer to the credit of the Hail Insurance Department, or to the tax sale certificate holder, as the case may be, shall be entitled to have refunded to him from the Hail Insurance Department the amount paid by him on account of such hail indemnity taxes, upon filing application and proof as hereinafter provided, but no interest shall be considered to have accrued thereon from the time of such payment by said lien holder; *provided that anyone who had paid hail indemnity taxes under compulsion for and on behalf of the paramount lien holder shall be considered the agent of such lien holder.*

"Section 4. Such paramount lien holder mentioned in the last preceding section must make application for refund to the Commissioner of Insurance, tendering his tax receipt containing a notation thereon by the County Auditor showing amount of such hail indemnity tax, penalty and interest paid by him, and an assignment thereof to the Hail Insurance Department, and make satisfactory proof to the Commissioner of Insurance that at the time he *or his agent* paid the said taxes the hail indemnity tax, penalty and interest thereon noted by said County Auditor did not constitute a valid lien paramount to lien held by him. Upon being satisfied of such facts the Commissioner of Insurance shall refund to said lien holder the amount of said hail taxes, penalty and interest paid by him, and shall also issue him a certificate showing the amount of general taxes, penalty and interest which remains as an additional lien to the credit of said taxpayer's mortgage. Upon making such payment and certificate the Commissioner shall take an assignment of the tax receipt in trust for the benefit of the Hail Insurance Department so far as it relates to said indemnity hail tax, and in case the title of the land affected passes and again reverts to the original mortgagor the hail indemnity taxes shall again attach as a lien upon his interest.

"Section 5. Such refunds to certificate holders and to holders of paramount liens who paid hail indemnity taxes for which they were not liable shall be made from the following funds, to-wit: A reserve fund that has been set aside or otherwise created or treated as existing in the Hail Insurance Department as a fund to meet anticipated re-

funds, or abatements of the indemnity hail taxes, and the fund created by interest collected on all interest bearing funds, of. the State Hail Insurance Department for the year 1927, and successive years. These funds shall be resorted to in order stated to whatever extent may be necessary to make all such refunds."

The appellant contends that this statute must be construed as though the words "under compulsion" did not appear in § 3, for the reason that the title is not broad enough to include legislation covering payments made under compulsion. In the event this contention be not sustained, an alternative interpretation is suggested under which payments made in the circumstances shown in this record would be regarded as made under compulsion within the act.

The title of the act reads: "An Act to amend and re-enact chapter 172 of the Session Laws of North Dakota for the year 1927, providing for a refund to hail tax purchasers and persons paying hail taxes for which they were not liable, designating the funds from which payment shall be made, and declaring the duty of the insurance commissioner in relation thereto." It is said that this violates § 61 of the Constitution which provides that no bill shall embrace more than one subject which shall be expressed in its title and that a bill which violates this provision shall be invalidated only as to so much thereof as shall not be so expressed. We are of the opinion that there is no merit to the contention that under the title quoted above legislation could not be enacted limiting authorized refunds to moneys paid under compulsion. Refunds of taxes illegally exacted are generally conditioned on the existence of such compulsion as will negative voluntary payment. Consequently, any legislation that would purport to deal with the subject of refunding can very appropriately prescribe all the conditions that must exist to authorize it. It is elementary, of course, that a title does not need to be a complete index of the details of the legislation. The subject of refunds is incorporated in the title to the act in question, and the statement of a condition which but defines the circumstances in which refunds are to be allowed is clearly germane to and connected with the subject. See 59 C. J. 812.

Were the payments made shown to have been payments under compulsion? The stipulated facts shown that prior to the decision of this court in Davis v. McLean County, 52 N. D. 857, 204 N. W. 459, supra,

the so-called hail indemnity taxes were treated as other taxes; that although they were not in law liens prior to existing mortgages this was not generally understood and the officers charged with collection uniformly required the hail indemnity tax to be paid as though it were a general tax and they did not understand that there was any authority in law to differentiate between the two. While there was no tender of the general taxes exclusive of the hail indemnity taxes, it is said that this fact is unimportant in view of the general practice under which all were required to be paid together. In these circumstances it is contended there was in fact a payment under compulsion within the statute.

In considering this contention one important circumstance should be noted. The hail indemnity taxes are not in any sense illegal. They constitute valid liens upon the land, but the lien is subsequent to the lien of prior mortgages. Davis v. McLean County, supra; State v. Johnson, 54 N. D. 184, 208 N. W. 966.

There is nothing in the record to show that the plaintiff treated the lien of the hail taxes as affecting it differently than the lien of the general taxes. For aught that appears, it paid the hail indemnity under the mistaken belief that the lien was prior to its mortgage. It does not affirmatively appear, as it did in the case of Chicago, M. & P. S. R. Co. v. Bowman County, 31 N. D. 150, 153 N. W. 986, that at the time of payment such a charge was regarded by it as being illegal or as an inferior lien which was discharged to prevent penalties accruing on a superior lien. Neither does it appear that such payment was exacted as a condition of obtaining a public service which the plaintiff was entitled to receive without such payment, as in Diocese of Fargo v. Cass County, 28 N. D. 209, 148 N. W. 541. There is, in short, no affirmative showing of protest or of compulsion. On the contrary, the facts rather show a voluntary payment and a subsequent discovery by the plaintiff that its lien was in law superior to a portion of the lien discharged by such payment.

What is shown with regard to the practice of the collection officers merely reflects what probably would have resulted if the plaintiff had in fact tendered the general taxes exclusive of the hail tax. To hold that compulsion within the refund statute may be predicated upon the probable conduct of the collection officers in declining to accept from

the mortgagee a tender of a portion of the entire lien would be to attach no meaning whatsoever to the words "under compulsion." For, it would follow that every payment by a paramount lien holder would be a payment under compulsion. We cannot assume that these words were written into the statute by amendment in 1931 to no purpose. By these words it must have been intended to distinguish between a voluntary payment by a paramount lien holder and an involuntary payment. We are of the opinion that the record does not show the payment in question to have been made under compulsion.

We are impelled to this conclusion, not only by considerations of obedience to the fundamental rule for the construction of statutes which requires that the words employed should be given, if possible, their ordinary meaning, but by the history of the statute which evidences a legislative intention to restrict its application. In view of this history, we think the ordinary restrictive meaning of the phrase "under compulsion" is consistent with that evident intention and, consequently, that an artificial meaning cannot be given to the expression. In the first enactment providing for refunds to paramount lien holders (Sess. Laws 1929, chap. 147, § 3), there were no limitations or requirements other than that the claimant be a holder of a paramount lien, that he had paid a hail indemnity tax for any prior year in connection with the payment of the general taxes, and that he had not been otherwise compensated. Claims for refunds under this statute could have been made at any time prior to January 1, 1930. This was a wide open refund statute. Any paramount lien holder who had not been otherwise compensated for such payment was entitled to the remedy therein provided. In 1931, a year after the limitation for filing claims under this wide open 1929 law had expired, the legislature re-enacted its provisions with certain changes. The 1931 law provided for refunds to paramount lien holders only as to hail indemnity taxes paid by them "prior to July 1, 1926," and for the first time employed the restrictive expression "under compulsion." The statute on its face, therefore, shows a legislative intention to restrict the claims that may be filed under it to payments made prior to a certain time, as well as to those made under compulsion. These restrictions are made only after the failure of claimants to have presented their claims under the wide open statute, the limitation of which had already run. In view of this his-

tory and of the restrictive purpose evidenced on the face of the statute, we are of the opinion that we are not at liberty to disregard the ordinary meaning of the restrictive phrase "under compulsion,"—even though, given its ordinary meaning, the statute may have an exceedingly narrow application.

As to a portion of the hail indemnity paid by the plaintiff, another reason appears why the refund claim is not within the statute. As stated above, the amount paid by the plaintiff for hail indemnity for 1921 and 1922 was added to the amount of the plaintiff's mortgage and included in its bid at the foreclosure sale. No redemption being had, the plaintiff obtained title to the property under its sheriff's certificate. The original refund statute, chapter 172 of the Laws of 1927, was clearly designed to protect holders of tax certificates whose liens to the extent of hail indemnity taxes included therein had been cut out by holders of paramount liens. To obtain the refund they were required to make a showing that they had not been compensated in any way for the moneys paid for the certificate. The subsequent amendments to this chapter, as above stated, extended the right of refund to the holders of paramount liens who had paid hail indemnity taxes under compulsion in connection with the payment of general taxes; and as an evidence that they were not to obtain refunds where they had been otherwise compensated they are required by § 4 of the present act to assign the tax receipts in trust for the benefit of the hail insurance department so far as they relate to the indemnity hail tax, so that in case the title to the land should subsequently revert to the original mortgagor the hail indemnity taxes should again attach as a lien upon his interest. Obviously, if a mortgagee who has included in his bid at the foreclosure sale the amount paid by him as an indemnity hail tax should, after obtaining a deed in foreclosure, assign his tax receipt to the hail insurance department, the department would obtain no right by virtue of the receipt, because as between mortgagor and mortgagee such lien is discharged. It is part of the purchase price of the land paid by the mortgagee. (See Harvison v. Griffin, 32 N. D. 188, 155 N. W. 655; Sletten v. First Nat. Bank, 37 N. D. 47, 163 N. W. 534; Security Bldg. & L. Asso. v. Bacon, 62 N. D. 658, 244 N. W. 644), and if the department succeeding to the rights of the mortgagee on the tax receipt should subsequently attempt to enforce the lien against the mort-

gagor to whom the title had reverted, it would be met with the contention that the lien had been discharged. It was clearly not the intention of the law to permit a purchaser holding a paramount lien to be compensated twice for the hail indemnity tax—once by including the same in its purchase and again from the hail fund. Neither was it the purpose to require the mortgagor in any case to pay the hail tax twice —once to the mortgagee if he redeems and again to the hail department when title reverts.

But it is suggested that the attempt to include the hail indemnity in the foreclosure was a nullity and that by so doing the plaintiff bid an amount in excess of that which was due under its mortgage for which excess it is accountable to the mortgagor or subsequent lien holders. The record does not show that there is any subsequent lien holder that was not subject to the lien of the hail indemnity, nor does it show that the mortgagor has made any claim to the surplus, nor but that if such claim should be asserted it could be successfully opposed by the plaintiff or the sheriff by showing that the plaintiff was at least an equitable assignee or subrogee of the hail indemnity lien and that in any event the lien is superior to the right of the mortgagor. See Beyer v. Investors' Syndicate, 31 N. D. 247, 153 N. W. 476. It does not appear that the indemnity was treated as a surplus.

Since it was the primary intention of the legislature to prevent loss to tax certificate holders and prior incumbrancers, and since it is not evident that a prior incumbrancer who has voluntarily bid the amount of hail indemnity taxes paid by it, over and above the amount of its mortgage indebtedness, will sustain a loss unless refund is allowed, such purchaser has not brought itself within the terms and spirit of the statute as to such portion of its claim.

The parties to this litigation are not in accord with respect to the construction of § 5 of the Act and with respect to the identity of the funds out of which the statute directs the refunds to be made. The appellant contends that the reserve fund mentioned in § 5 of the Act includes, by construction at least, whatever moneys have been paid into the hail fund by tax purchasers and superior lien holders who were entitled to refunds under the Act and whose money has indirectly gone to replenish the revolving fund from which losses were immediately paid. It is contended that some $585,000 are thus traced to the

hail fund through payments made from such sources, and that, in legal effect if not in reality, it exists in the hail fund as a reserve for refunds. This is shown, partly at least, it is contended, by the claims filed and the proofs required to accompany such claims. In any event it is contended that on January 1, 1927, there was a credit in the fund levied for the purpose of making refunds of $243,393.77, and that crediting this fund with interest on C. D.'s, on daily balances, with delinquent taxes and other items, the aggregate credits to January 31, 1932, amounted to $485,785.98, and deducting refunds made during the period of $395,047.72 a credit balance is left in the fund of $90,738.26. As against this contention the respondent contends that such reserve fund was not entitled to be credited with some of the substantial items enumerated by the plaintiff and that there is in reality a deficit in this reserve fund of $130,536.18. In any event, the respondent contends that the statute cannot be so construed as to enhance the "reserve fund" in the manner suggested by the appellant, nor to direct payment from other adequate funds. Inasmuch as it has become necessary for us to determine this cause adversely to the plaintiff upon the merits of its claim and in so determining it to find that the plaintiff is not within the statute authorizing refunds, we feel it is neither necessary nor proper to determine in this cause the validity of the respective contentions concerning the funds out of which refunds may be made.

Judgment affirmed.

NUESSLE, CH. J., and BURR and BURKE, JJ., concur.

CHRISTIANSON, J. (dissenting in part). I agree with those portions of the opinion prepared by Mr. Justice Birdzell relating to the matters covered by paragraphs one, three and four of the syllabus; but I disagree with that portion of the opinion relating to the matter covered by paragraph two of the syllabus. In my opinion § 3, chapter 171, Laws 1931 did not contemplate that the holder of a lien paramount to the hail indemnity tax lien should be entitled to recover hail indemnity taxes which he has paid only in cases where the payment was involuntary in the sense that the terms "voluntary" and "involuntary" are ordinarily employed as regards the recovery of taxes that have been paid. It is true the statute uses the words "paid under compulsion"

but if those words are given the meaning that they generally possess, and attributed to them by the majority members, then the statute becomes not merely meaningless but positively injurious and could have no result except to bring about needless expense and confusion without any possible benefit to anyone. It is difficult to conceive of circumstances in which payment of hail indemnity taxes could have been exacted under compulsion from the holder of a lien paramount to the lien of such taxes in the sense that the term "under compulsion" is generally understood as applied to the recovery of taxes paid. No one has been able to suggest a situation where any such condition could have existed. There was no way whereby the holder of such lien could have been deprived of his property rights by reason of hail indemnity taxes or by enforcement of the lien of such taxes. All that possibly could have happened would have been that the property would have been sold for taxes, including the hail indemnity taxes but the holder of a prior paramount lien could always have protected himself by payment or tender of the "real" taxes against the premises without regard to the hail indemnity taxes. If payment had been refused he doubtless would have been entitled to resort to the courts and by appropriate writ could have compelled the county treasurer to accept the taxes tendered and to issue a proper tax receipt. He also could have brought action to cancel any claimed lien for such taxes or any tax certificates based thereon. Hence, when the lawmakers used the words "paid under compulsion" in this statute they must have had in mind a situation different from that generally contemplated when those words are used as regards the recovery of taxes that have been paid. It is well settled that the same words may have different meanings not only in different statutes but even in the same statute.

To ascertain the legislative intention as regards § 3, chapter 171, Laws 1931, it is well to consider the conditions existing at the time the law was enacted. What mischief or wrong was the statute intended to correct? What purpose was it intended to accomplish? The state hail insurance department was established in 1919. Laws 1919, chap. 160. In that act provision was made for the levy of a flat acreage tax and a hail indemnity tax. Id. §§ 6, 7. And it was specifically provided that "all provisions of law with reference to lien and collection of

taxes shall apply to the taxes herein specified." Id. § 10. In short, the laws were framed so as to make it impossible for any person to pay general taxes against any tract of land that was subject to a hail indemnity tax unless such hail indemnity taxes also were paid; and if the property went to sale for delinquent taxes the land must be sold for the amount due both for general taxes and hail indemnity taxes and only one certificate of tax sale might issue. State ex rel. Olsness v. McCarthy, 53 N. D. 609, 207 N. W. 436.

It is a matter of common knowledge that the statutory provisions were obeyed by the officials charged with the collection of taxes and that such officials treated hail indemnity taxes as actual legal taxes and that payment of a general tax would in no instance have been accepted unless it was accompanied by the full amount of any outstanding hail indemnity tax. This condition continued to exist throughout the state until the decision of this court in Davis v. McLean County, 52 N. D. 857, 204 N. W. 459. The decision in that case became final in June, 1925. That case involved a mortgage that had been executed, delivered and recorded several years before the law creating the hail insurance department had been enacted, and the precise question involved and determined in that case was whether a hail indemnity tax levied under the hail insurance act created a lien paramount to such antecedent mortgage. Whether a hail indemnity tax would or would not constitute a lien prior to mortgages executed subsequent to the enactment of the statute creating the hail insurance department but prior to the hail indemnity tax was not involved in Davis v. McLean County. That precise question, however, was involved and decided in State v. Johnson, 54 N. D. 184, 208 N. W. 966.

Under the hail insurance act the owner of land liable to hail indemnity tax might "at any time prior to the 15th day of June, in each year, withdraw any portion or all land owned by such person from the levy of said hail indemnity tax upon the making and filing of an affidavit, together with application for withdrawal, with the county auditor." 54 N. D. 187. In State v. Johnson, supra, this court held that the hail indemnity tax for any given year did not in any event become a lien upon the land until after the 15th day of June of such year, and that, consequently, a mortgage executed and recorded prior to June 15th was a lien prior to such indemnity tax. The precise

question involved in State v. Johnson, supra, was whether a real estate mortgage executed on May 6, 1920 constituted a lien prior and superior to the lien of a hail indemnity tax for that year. The court held that inasmuch as the mortgage became a lien May 6, 1920, and the hail indemnity tax did not become a lien until after June 15, 1920, that the mortgage was a prior lien and that the holder of such mortgage was entitled to redeem the premises from a tax sale by paying the amount of the general taxes that were included in the tax sale certificate and that such holder was not required to tender or pay the hail indemnity taxes. The decision in State v. Johnson, supra, became final May 26, 1926. Hence we have this situation: the first definite and authoritative rule announced in this state to the effect that the lien of a hail indemnity tax is inferior and subordinate to all valid liens in existence and of record at or prior to the time that the tract of land becomes liable for the hail indemnity tax for a particular year, came into being May 26, 1926.

In many instances tax sale certificates upon lands that were subject to prior mortgages included hail indemnity taxes, and as a result of the application of the rule announced in State v. Johnson, supra, the holders of such tax sale certificates in many instances lost the amount represented by hail indemnity taxes; and, as a consequence, at the tax sale held in December, 1926, few persons were willing to purchase lands where the amount of delinquent taxes for which the lands were sold included hail indemnity taxes. Thereupon the legislative assembly that convened in January, 1927, enacted the law which provided that the holder of a tax sale certificate in part based upon hail indemnity taxes, and where the lands were subject to a paramount lien and the foreclosure of such lien had resulted in "cutting out" the purchaser's right under the tax certificate, upon application to the commissioner of insurance, should be entitled to a refund of the amount of the purchase price represented by the hail indemnity tax together with five per cent interest on such amount. The statute contained a provision that the claim for refund must be made within a year after the loss of title by the foreclosure of the paramount lien, except in cases where the loss had occurred prior to January 1, 1927, in which case the claim might be presented at any time prior to January 1, 1928. It

was further provided that no claim for a refund should be allowed unless made before January 1, 1928. Laws 1927, chap. 172.

The legislative assembly which convened in January, 1929, amended and re-enacted this law and made it applicable not only to the holder of a tax sale certificate but also to the holder of any lien paramount to a hail indemnity tax who had "paid hail indemnity taxes in connection with the payment of general taxes against the land covered by his lien, which hail indemnity taxes have been paid over by the county auditor or treasurer to the state treasurer to the credit of the hail insurance department, or to the tax sale certificate holder as the case may be," etc. Laws 1929, chap. 147. Provision was made, also, whereby an applicant for refund must assign his claim for the hail indemnity tax to the commissioner of insurance and upon the presentation of an application accompanied by such assignment, the insurance commissioner was authorized to refund to tax certificate holders and to holders of paramount liens who had paid hail indemnity taxes, the amount of such hail indemnity taxes with interest at the rate of 5 per cent per annum. This statute also contained a provision limiting the time in which claims for refunds must be presented. As regards claims for refund of taxes paid by a mortgagee who was holder of a paramount lien, it provided that no claim for refund should be allowed unless made before January 1, 1930. Laws 1929, chap. 147, § 6. Both the statute enacted in 1927 and the one enacted in 1929 required the commissioner of insurance to make a report to the succeeding session of the legislative assembly of the refunds made under the provisions thereof together with the fullest practical statement of probable outstanding claims and an estimate of the amounts that would be required in succeeding years to meet the requirements of the act. Laws 1927, chap. 172, § 6; Laws 1929, chap. 147, § 7.

The legislative assembly that convened in January, 1931, amended and re-enacted chapter 147, Laws 1929. Laws 1931, chap. 171.

Section 3 of the 1931 act provided:

"Any holder of a lien paramount to the hail indemnity tax lien who, prior to July 1st, 1926, has paid under compulsion hail indemnity taxes in connection with the payment of general taxes against the land covered by his lien, . . . shall be entitled to have refunded to him from the Hail Insurance Department the amount paid by him on ac-

count of such hail indemnity taxes, upon filing application and proof as hereinafter provided, but no interest shall be considered to have accrued thereon from the time of such payment by said lien holder; provided that anyone who has paid hail indemnity taxes under compulsion for and on behalf of the paramount lien holder shall be considered the agent of such lien holder."

This statute also contains a provision similar to that contained in the two previous statutes, to-wit:

That "at each succeeding session of the legislature the Commissioner of Insurance shall make a report to the legislature of the refunds made under the provisions of this act, together with the fullest practical statement of probable outstanding claims, together with an estimate of the amounts that will be required in succeeding years to meet the requirements of this act." Id. § 7.

The report rendered by the Commissioner of Insurance to the legislative assembly that convened in January, 1931, disclosed that under the provisions of chapter 147, Laws 1929, refunds allowed to holders of superior liens aggregated $236,071.03. The report rendered by the commissioner of insurance to the legislative assembly that convened in January, 1933, discloses that refunds aggregating $262,632.42, were allowed and paid to holders of superior liens.

In the legislative enactment of 1931 it was provided:

"Such refunds to certificate holders and to holders of paramount liens who paid hail indemnity taxes for which they were not liable shall be made from the following funds, to-wit: A reserve fund that has been set aside or otherwise created or treated as existing in the Hail Insurance Department as a fund to meet anticipated refunds, or abatements of the indemnity hail taxes, and the fund created by interest collected on all interest bearing funds, of the State Hail Insurance Department for the year 1927, and successive years. These funds shall be resorted to in order stated to whatever extent may be necessary to make all such refunds." Id. § 5.

It will be noted that the legislative assembly contemplated that the applications for refund would involve considerable sums of money. Yet, if the interpretation that the majority members place upon this statute is correct, the amount of refunds, at most, would have been insignificant in amount.

The provision in the enactment of 1931 enabling "any holder of a. lien paramount to the hail indemnity tax lien who *prior to July 1, 1926* has paid under compulsion hail indemnity taxes" to obtain a refund becomes significant in view of the history of the hail insurance act.

As pointed out, the decision in State v. Johnson, supra (which definitely announced the rule that the lien of a hail indemnity tax is subordinate to a mortgage executed and recorded prior to the date that the implied contract between the owner of the land and the hail insurance department becomes effective) became final May 26, 1926, or, about a month before July 1, 1926. Of course, some time was required for the people to become informed of the decision of the Supreme Court, and it is reasonable to assume that the lawmakers had this in mind. Apparently the lawmakers felt that an injustice had been done to holders of liens paramount to hail indemnity taxes, who, by virtue of the language of the statute and the then prevailing interpretation and administration thereof, in effect had been compelled to pay hail indemnity taxes on the theory that the same were in fact and in law actual taxes and paramount to the liens held by them, and that persons who had made such payments were in justice entitled to a refund.

It seems to me that when the legislature spoke of payments having been made under compulsion it had in mind merely the compulsion that normally existed in every case where a person in the ordinary course of business, under the then prevailing practice, had paid taxes which in part consisted of a hail indemnity tax in order to protect his lien, as the legislature well knew that in such circumstances he, in fact, had been compelled to pay the hail indemnity tax in order to pay taxes at all. Apparently this was also the construction that was placed upon the statute by the officers charged with the duty of executing it. In the report submitted by the commissioner of insurance to the legislative assembly in January, 1933, he sets forth an opinion of a special Assistant Attorney General from which I quote:

"Were it not for the history back of chapter 171, Session Laws of 1931, as disclosed by previous legislative enactments on the same general subject matter, we would have no hesitancy in holding that in our opinion none of the claims for refunds of the types to which our attention has been called, so far as paramount lien holders are concerned,

would be eligible for such refunds in view of these provisions of this statute providing for such refunds when the original payments were made under compulsion. The reason for this is that said payments were made by such paramount lien holders voluntarily and not under legal duress and written protest. . . . To give the ordinary effect and interpretation to the words 'under compulsion' as found in chapter 171 would apparently defeat the otherwise clear intention of the legislature to refund to all designated paramount lien holders the hail indemnity taxes which they paid and for which they were not legally liable. When this result is taken into consideration and is construed in the light of the apparent intent of the legislature as indicated both by the remainder of the body of the act and its title, it would seem that the words 'under compulsion' above referred to should be disregarded as surplusage as their retention in the act would seem to make this legislation meaningless and ineffectual. On the other hand, it is indeed a serious matter for an executive or administrative department to assume the responsibility of interpreting legislative enactments in such a way as to completely ignore certain restrictions laid down by the legislature even though the act may become practically meaningless if such a determination is not made.

"We understand that the Attorney General of this state has held in substance that the restriction indicated by the use of the words 'under compulsion' should be disregarded by the department in making refunds under chapter 171 for the reason that if this is not done the otherwise clearly expressed intent of the legislature, with respect to such refunds, would be totally defeated. While we are of the opinion that this is the logical conclusion to be reached, nevertheless, the question is not free from doubt and in view of other problems which we shall hereafter discuss, we are inclined to be of the opinion that this particular question might well be submitted to the courts for determination."

The Commissioner of Insurance caused to be printed appropriate blanks on which applications for refunds might be made under the 1931 statute by holders of superior liens who had paid hail indemnity taxes. And, as said, the report made by the Commissioner of Insurance to the legislative assembly in January, 1933, discloses that refunds aggregating in all $262,632.42 had been allowed to holders of superior liens, although as indicated in the opinion of the Assistant

Attorney General, not a single claim for refund has been presented that was properly allowable under the construction that the majority members place upon the 1931 statute. I do not believe the lawmakers intended that the words "under compulsion" should have the meaning ordinarily attributed to them in actions to recover taxes paid. I believe that the lawmakers used these words in light of the facts with which they were dealing, and that they intended to allow a refund to every holder of a prior lien who, under the then prevailing practice, actually had been compelled to pay hail indemnity taxes in connection with general taxes. The obvious purpose of the statute was to create a liability where no liability formerly existed, i. e., to authorize a refund to persons who, if they had actually known their legal rights, would not have paid hail indemnity taxes but who nevertheless had been compelled to pay such taxes in connection with general taxes.